# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

GLADYS FAYE WEBB,

      Plaintiff,

v.                                                                          CIVIL ACTION NO. 2:19-cv-00392

ANDREW SAUL,[1]
Commissioner of Social Security,

      Defendant.


## **PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Gladys Faye Webb ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  By standing order entered on January 4, 2016, and filed in this case on May 20, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 8) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 9).

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 8), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 39 years old at the time of her alleged disability onset date and 44 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 40–41.)[2]  She completed the tenth grade.  (*Id*. at 48, 206.)  She has previously been employed as a cook for a university's food service provider and as a cashier at a fast-food restaurant.  (*Id*. at 49–50, 211.)  Claimant alleges that she became disabled on January 24, 2013, due to depression, arthritis, anemia, acid reflux, vertigo, high blood pressure, "stomach problems," "bad nerves," sciatica, and "bad knees."  (*Id*. at 201, 205.)

Claimant protectively filed her application for benefits on October 30, 2015.  (*Id*. at 39; *see id*. at 188–93.)  Her claim was initially denied on April 27, 2016, and again upon reconsideration on August 2, 2016.  (*Id*. at 96–101, 110–16.)  Thereafter, on August 25, 2016, Claimant filed a written request for hearing.  (*Id*. at 117–19.)  An administrative hearing was held before an ALJ on April 17, 2018, in Huntington, West Virginia, with the ALJ appearing from Baltimore, Maryland.  (*Id*. at 31–70.)  On June 22, 2018, the ALJ entered an unfavorable decision.  (*Id*. at 12–30.)  Claimant then sought review of the ALJ's decision by the Appeals Council.  (*Id*. at 182–85.)  The Appeals Council denied Claimant's

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 7.

request for review on March 21, 2019, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id*. at 1–6.)

Claimant timely brought the present action on May 18, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 2.)  The Commissioner filed an Answer (ECF No. 6) and a transcript of the administrative proceedings (ECF No. 7).  Claimant subsequently filed her Brief in Support of Judgment on the Pleadings (ECF No. 8), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 9).  As such, this matter is fully briefed and ready for resolution.

### B.  *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1.  *Mental Health Treatment*

On November 17, 2015, Claimant presented to her primary care physician and complained of "depressed mood, irritability, short temper, [and] poor sleep." (Tr. at 344.) She expressed that she was "worried because her son is in the military and could be deployed at any time."  (*Id*.)  She reported taking her mother's anxiety medication and requested "a referral to psychiatry for talk therapy." (*Id*.)  Claimant's physician noted that she was fully oriented but "tearful and anxious."  (*Id*. at 346.)  Claimant was diagnosed with depression, prescribed medication, given a psychiatry referral, and directed to follow up in one month.  (*Id*. at 347.)  At the follow-up appointment on December 15, 2015, Claimant reported that she had stopped taking the medication her physician prescribed

"because it made her 'feel like a zombie.'" (*Id.* at 340.) Her mental status was normal that day. (*Id.* at 343.)

Claimant had her initial evaluation with a psychiatrist on March 7, 2016. (*Id.* at 349.) She reported that she had experienced depression for the preceding two years "following her oldest son moving out and joining the Army." (*Id.*) She related depressed mood, "sleep disturbance with early and middle insomnia," low energy, "increased appetite particularly in the evenings with weight gain," lack of motivation, "anhedonia, and intermittent hopelessness." (*Id.*) She also reported increased anxiety. (*Id.*) Her mental status examination was normal aside from a "worried and down" mood and affect. (*Id.* at 351.) She was diagnosed with depression, prescribed medication, and referred to a psychotherapist. (*Id.* at 351–52.)

At an April 4, 2016 follow-up appointment with her psychiatrist, Claimant reported "feeling better and estimate[d] that overall her symptoms are ~40% improved." (*Id.* at 353.) She stated that she "[s]till has some low days and still experiences generalized worries." (*Id.*) She also stated that she "[s]truggles with motivation but does get out of the house now more days than not." (*Id.*) She reported no side effects from her medication. (*Id.*) Her mental status examination that day was normal, and the psychiatrist observed that Claimant was smiling. (*Id.* at 355.) The psychiatrist increased Claimant's dosage of medication. (*Id.* at 356.)

Claimant returned to her psychiatrist on September 19, 2016, and reported that her "mood has improved considerably" and that she was "[t]olerating [her] medication well and feels it is helping." (*Id.* at 539.) However, she reported that she "[c]ontinues to have poor quality sleep and low daytime energy" and complained of fatigue. (*Id.*) Her mental status examination was normal. (*Id.* at 541.) Claimant's psychiatrist

4

recommended that Claimant continue taking her medication and noted that Claimant was "[o]btaining benefit from pharmacotherapy but if does not obtian [sic] full response will re-visit psychotherapy as adjunctive treatment." (*Id.* at 543.)

Claimant presented to a new psychiatrist for a routine follow-up appointment on July 3, 2017. (*Id.* at 530.) She reported that she was "doing well with depresion [sic] and anxiety" and that her prescribed medication "has helped both." (*Id.* at 533.) She reported getting six to eight hours of sleep each night. (*Id.*) Her mental status examination was normal that day, and the psychiatrist observed that she "[a]ppears happy" and "easily smiled." (*Id.* at 535.) The psychiatrist summarized, "Depression and anxiety well controlled on medication. . . . Overall the patient's risk is felt to be a minimal concern." (*Id.* at 535–36.) Claimant was instructed to continue her medication, and the psychiatrist noted that there was "[n]o need for therapy at the moment." (*Id.* at 536.) She was directed to follow up in six months. (*Id.*)

### 2. *Treatment for Back Pain*

On October 2, 2014, Claimant presented to an urgent care clinic, complaining of pain in the right side of her lower back that radiated down her leg. (*Id.* at 448.) She described the pain as "[m]oderate" and stated that she "helped a friend move furniture and exacerbated [her] low back pain." (*Id.*) She also explained that she had a history of "sciatic nerve pain." (*Id.*) Upon physical examination, Claimant's gait and stance and lower-back range of motion were normal, and she had "[f]ull strength against resistance." (*Id.* at 449.) There was "[p]araspinous tenderness noted," and pain upon movement. (*Id.*) Her "lower extremity motor function" and "[p]atellar reflexes" were normal. (*Id.*) She was given a pain injection and prescribed medication, and she was instructed to apply ice and a warm compress and follow up with her primary care physician. (*Id.*)

Claimant again presented to an urgent care clinic on January 8, 2015, complaining of a back injury after a fall. (*Id.* at 457.) A physical examination was normal, except for "[p]araspinous tenderness" in the lower back and tenderness in the "[r]ight posterior hip." (*Id.* at 458.) Claimant was diagnosed with a lumbar sprain and given an injection for the pain. (*Id.*) She was also prescribed pain medication and a muscle relaxer. (*Id.*)

On May 13, 2016, Claimant presented to an urgent care clinic, complaining of low back pain that radiated into her right leg. (*Id.* at 476.) She stated that it began after helping her father dig up and plant flowers a few days prior. (*Id.*) She reported that she had "chronic back pain." (*Id.*) Upon physical examination, Claimant had a reduced range of motion in her lower back "due to pain," as well as "[p]araspinous tenderness" and a muscle spasm." (*Id.* at 477.) She was given a steroid injection and prescribed pain medication and a muscle relaxer. (*Id.* at 477–78.)

### 3. Treatment for Knee and Leg Pain

On January 5, 2015, Claimant reported to her primary care physician that she was suffering from "increased arthritic pain" in her "shoulders, hips, wrists, and knees." (*Id.* at 323.) She requested switching to ibuprofen to treat it and acknowledged that "her arthritis would improve if she loses weight." (*Id.*) Her gait and station were observed to be normal that day. (*Id.* at 325.) Claimant was given a prescription for ibuprofen and scheduled to return for a follow-up appointment to address her "arthritis and chronic conditions." (*Id.* at 326.) At the follow-up appointment on June 10, 2015, Claimant stated that her knee pain was "[w]orsening" and was worse in her right knee than her left. (*Id.* at 300.) She expressed interest in receiving cortisone injections. (*Id.*) Upon physical examination, her gait and station were observed to be normal. (*Id.* at 302.) Her physician ordered x-rays of her knees and instructed her to continue to take naproxen for her pain.

(*Id.* at 303.)  The x-rays revealed "[m]ild degenerative change of the bilateral knees."  (*Id.* at 397.)

On August 14, 2015, Claimant received injections in each of her knees.  (*Id.* at 291.) However, at a follow-up appointment on November 17, 2015, Claimant related that the injections were not helpful, and "the left knee is now worse."  (*Id.* at 344.)  She requested a change in her medication, and her primary care physician acquiesced to the change.  (*Id.* at 344, 347.)

On February 8, 2017, Claimant reported to her primary care physician that she had experienced swelling in her feet, worse in the left foot than the right, for the previous several months.  (*Id.* at 640.)  Her physician observed bilateral edema in her legs and requested lab work and an echocardiogram.  (*Id.* at 645.)  She noted, "Likely not cardiac but rather deconditioning and morbid obesity/venous stasis but caution warranted."  (*Id.*) The echocardiogram was normal.  (*Id.* at 646.)

At an appointment with her primary care physician on November 15, 2017, Claimant reported that her "[l]egs hurt all the time" and that she "uses mentholated rub" for the pain.  (*Id.* at 577.)  She described her pain "as aching pain and cramping sensation" that improved with "wiggling her feet."  (*Id.*)  Her physician suspected that Claimant had "a variant of [restless leg syndrome]."  (*Id.*)  She also noted that Claimant's edema had "improved."  (*Id.* at 581.)  Upon physical examination, Claimant walked with a normal gait, and her range of motion, stability, and muscle strength were all normal.  (*Id.*)  Her physician increased her B12 supplement and prescribed nerve medication.  (*Id.* at 584.)

### 4.  *Treatment for Sleep Apnea and Insomnia*

At her intake evaluation with her psychiatrist on March 7, 2016, Claimant reported experiencing "multiple sleep awakenings with gasping for air."  (*Id.* at 349.)  The

psychiatrist diagnosed her with "[i]nsomnia disorder with non-sleep disorder mental comorbidity." (*Id.* at 351.) She ordered a sleep study to evaluate Claimant for sleep apnea. (*Id.* at 352.) At a follow-up appointment on April 4, 2016, Claimant reported to her psychiatrist that her "[s]leep remains nonrestorative." (*Id.* at 353.)

Claimant's sleep study was performed on June 5, 2016, and she was diagnosed with severe obstructive sleep apnea syndrome and sleep disturbance with sleep onset insomnia. (*Id.* at 369–70.) It was recommended that she return "to the sleep lab for a CPAP titration study." (*Id.* at 370.) It was further recommended that Claimant lose weight, sleep on her side and keep the head of the bed elevated, and avoid "sedatives, hypnotics or CNS depressive medications, especially prior to . . . bedtime." (*Id.*) She returned for a follow-up appointment on August 16, 2016, continuing to complain of fatigue, "[d]aytime somnolence, difficulty falling asleep, middle-night awakening with a choking sensation . . . and difficulty getting going in the morning." (*Id.* at 679.) She was scheduled for a CPAP titration study and advised to "lose weight and sleep on side and keep head of the bed elevated." (*Id.* at 683.)

The CPAP titration study was conducted on September 21, 2016, and Claimant was fitted for a CPAP machine. (*Id.* at 676.) She complained that the mask did not fit well at her follow-up appointment on January 10, 2017, and was given a different mask. (*Id.* at 652.) At that same appointment, Claimant reported that she was sleeping five to eight hours and was "very happy [the CPAP machine] is helping her." (*Id.* at 647, 652.)

On November 15, 2017, Claimant reported to her primary care physician that she was using the CPAP machine, but she "still has daytime sleepiness." (*Id.* at 577.) Her physician expressed concern that the CPAP machine may not be on the "correct setting." (*Id.*) Claimant also reported fatigue, and her physician noted "[s]ome weakness

diffusely." (*Id.*)  Claimant's physician recommended that Claimant seek a follow-up appointment with her sleep specialist for "repeat titration study or adjustment of settings due [to] her fatigue." (*Id.* at 584.)

### 5. *Treatment for Vertigo and Hearing Loss*

Claimant presented to an urgent care clinic on January 24, 2015, complaining of dizziness and neck and facial pain that had lasted for several days. (*Id.* at 460.)  She reported that she also experienced nausea and vomiting. (*Id.*)  She was diagnosed with vertigo, prescribed motion-sickness medication, and instructed to follow up with her primary care physician. (*Id.* at 462.)

At a routine appointment on June 10, 2015, Claimant reported to her primary care physician that she had been experiencing dizziness with nausea "and some vomiting" and occasional facial numbness "about once a month" for "a few months." (*Id.* at 300.)  She also stated that "[t]urning [her] head and bending over makes it worse," and she "[f]eels that her 'ear clogs' sometimes." (*Id.*)  She had no symptoms during her appointment. (*Id.*)  Her primary care physician suspected vertigo and referred her to a balance specialist. (*Id.* at 300, 302–03.)

The balance specialist conducted an evaluation on July 8, 2015, noting that Claimant had an "abnormal gait" and suffered from dizziness, difficulty walking, and weakness. (*Id.* at 293.)  Upon physical examination, Claimant had a positive Dix-Hallpike test, indicative of vertigo. (*Id.* at 296.)  She was treated with a canalith repositioning procedure (also called an Epley maneuver) and directed to follow up "once approved." (*Id.*)

On August 14, 2015, at her first appointment with her primary care physician following her balance evaluation, Claimant reported that her dizziness had improved

"with balance center Epley maneuvers," but she "[f]eels dizziness returning and discomfort in left ear." (*Id.* at 289.) Her primary care physician prescribed medication for dizziness and directed her to follow up with the balance specialist. (*Id.* at 289, 291–92.) However, at her next appointment with her primary care physician on November 17, 2015, Claimant reported that she "[h]as not been able to get back in due to insurance coverage issues." (*Id.* at 344.) She also reported feeling dizzy during her appointment. (*Id.*) Her primary care physician refilled her medication and ordered a new referral to the balance specialist. (*Id.* at 347.)

Claimant returned to the balance specialist on December 30, 2015, and stated that her symptoms improved after her previous treatment there. (*Id.* at 337.) However, she still reported feeling dizziness when "rolling over in bed to the [left]," looking up, bending forward, and lying supine. (*Id.*) She also stated "that her symptoms have produced increased fatigue." (*Id.*) Ambulation and balance deficits were noted upon evaluation, and an Epley maneuver was performed. (*Id.* at 338.)

At an appointment with a new primary care physician on October 26, 2016, Claimant reported that she had run out of medication for her dizziness and had not been taking it for about a month, and she was "[n]ot doing well." (*Id.* at 667.) She related that her medication "lightens the [symptoms]." (*Id.*) She also stated that she attended three physical therapy sessions, which "helped at first," but her symptoms "then recurred in [a] few days." (*Id.*) In addition, she reported "ringing" in her left ear. (*Id.*) She was given a refill of her medication and referred to an ear, nose, and throat specialist. (*Id.* at 673–74.) Claimant saw the specialist on November 9, 2016, and he performed an Epley maneuver and instructed Claimant on at-home exercises for vertigo. (*Id.* at 660.) He also ordered an audiogram, which revealed "normal to mild" hearing loss. (*Id.* at 703.)

At an appointment with her primary care physician on February 8, 2017, Claimant reported having "[n]o spells lately." (*Id*. at 641.)

## C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or

combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"   *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step.   *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).   The claimant's RFC reflects "her ability to perform work despite her limitations."   *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).   The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work."   *Lewis*, 858 F.3d at 862.   "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the

12

claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."   20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment."  *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities."  *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five."  *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At this

point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert [("VE")] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. at 17.) He found that Claimant's sciatica, osteoarthritis, irritable bowel syndrome, sleep apnea, vertigo, restless leg syndrome, insomnia, tinnitus with mild hearing loss, anemia by history, and obesity constituted "severe" impairments. (*Id.* at 17–20.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 20–21.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to lift and carry at the light exertional level . . . and stand and walk at the sedentary exertional level." (*Id.* at 21.) But he found that she "requires a workplace environment that will allow her to stand for a few minutes after sitting for 20–30 minutes," that she "can only occasionally utilize her lower extremities for pushing, pulling, and operation of foot controls," "can occasionally stoop and climb ramps and stairs," and "cannot climb ladders, ropes, and scaffolds and cannot balance on uneven surfaces, kneel, crouch, and crawl." (*Id.*) In addition, the ALJ determined that Claimant "most [sic] avoid concentrated exposure to extreme cold, excessive wetness, and

environmental irritants," that she "must avoid concentrated exposure to extreme cold, excessive wetness, and environmental irritants," that she "must avoid all work-related exposure to extreme heat and excessive humidity," that she "must avoid all exposure to excessive vibration, excessive heights, and hazardous machinery," and that she "must avoid all exposure to noise levels that are louder than those found in a normal office environment." (*Id.*) He further assessed that Claimant "needs readily available (meaning on-site) access to a restroom facility" and that she "is limited to performing simple, routine, and repetitive tasks." (*Id.*)

The ALJ concluded that Claimant "has no past relevant work." (*Id.* at 24.) He noted that Claimant is "a younger individual" with "a limited education" and that "[t]ransferability of job skills is not an issue because [Claimant] does not have past relevant work." (*Id.*) Because the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a VE to aid in his finding that Claimant is capable of working as an electronic worker, document preparer, or small parts assembler. (*Id.* at 24–25.) As a result, the ALJ concluded that Claimant was not "under a disability . . . since October 30, 2015." (*Id.* at 25.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.   ANALYSIS

Claimant argues that the ALJ erroneously determined that her mental impairments were not severe. (ECF No. 8 at 5.) She further asserts that the ALJ improperly found that she was capable of performing light work despite her physical impairments. (*Id.* at 5–6.) And she contends that the ALJ wrongfully discounted her subjective complaints and should have accepted the VE's testimony consistent with those complaints. (*Id.* at 6.) Claimant asks this Court to award her benefits or to remand this matter to the ALJ "for rehearing." (*Id.* at 7.) The Commissioner responds that the ALJ correctly determined that Claimant's mental impairments were not severe and that he properly conducted the RFC assessment and evaluated Claimant's subjective complaints. (ECF No. 9 at 10–17.)

#### A. *Severity of Mental Impairments*

Claimant first argues that the ALJ should have found that her major depressive disorder, insomnia, and generalized anxiety disorder are severe impairments. (ECF No. 8 at 5.) To evaluate the severity of a claimant's mental impairments using the "special

16

technique" prescribed by the regulations, the ALJ first "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1520a(b)(1)).  Next, the ALJ must "rate [the claimant's] functional limitation based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  Specifically, the ALJ analyzes a claimant's functional limitations by assessing the claimant's abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). If the claimant has no limitations or only mild limitations in these four areas, her "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [her] ability to do basic work activities." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

As an initial matter, the ALJ determined that Claimant's insomnia is severe.  (Tr. at 17.)  Therefore, to the extent Claimant argues that the ALJ erred by finding it not severe, her argument is clearly without merit.

The ALJ began his discussion of the severity of Claimant's mental impairments by noting "a few pertinent facts."  (Tr. at 18.)  Specifically, the ALJ stated that "the State agency psychological consultants both found [Claimant's] mental impairments to be non-severe . . . as they found [Claimant] only mildly limited, at most, in the four functional areas."  (*Id.*)  The ALJ further noted that Claimant "had normal or essentially normal psychological findings throughout the entire medical record" and "indicated [on a function report that] she had no significant problems with concentration, understanding,

17

memory and task completion." (*Id.*) The ALJ also observed that Claimant's "hearing testimony concentrated on her physical impairments with little time spent discussing her mental impairments." (*Id.*)

Next, the ALJ moved on to address each of the four functional areas. (*Id.* at 18–19.) In concluding that Claimant "has a mild limitation, at most, in understanding, remembering, and applying information," the ALJ observed that Claimant's depression and anxiety "improved quickly with the use of medications," that her memory, judgment, and insight were normal upon mental status examinations, and that "there was never any indication that she was impaired in her ability to understand." (*Id.* at 19.) The ALJ also noted that in a November 2015 function report, Claimant stated that she "had no issues with understanding or remembering, but in a June 2016 function report, she "alleged that her impairments affect her ability to understand and remember." (*Id.* at 18.)

In determining that Claimant "has a mild limitation" in interacting with others, the ALJ noted that Claimant "alleged issues getting along with others" in the function reports she submitted and testified at the hearing "that she does not like to be around other people." (*Id.* at 19.) However, he observed, Claimant's inability to interact with others "does not seem to be a pertinent theme in her mental health treatment records . . . nor the medical evidence of record as a whole." (*Id.*) The ALJ mentioned that "on a few occasions, [Claimant] was observed to have a negative mood and affect," but "on most occasions, she is noted as having a normal mood and affect," and "her psychiatric issues seemed to improve with her treatment." (*Id.*) And he noted that the state-agency psychological consultants both opined, "in opinions that are uncontradicted by any treating, examining or reviewing psychological source," that Claimant "had no more than a mild limitation in [interacting with others]." (*Id.*)

In finding that Claimant "has a mild limitation" in concentrating, persisting, or maintaining pace, the ALJ noted that in a November 2015 function report, Claimant "asserted that she had no issues" completing tasks, but in a June 2016 function report, she "alleged that her impairments affect her ability to complete tasks." (*Id.*) He further noted that "she asserted no issues with concentrating in either Function Report" and "was consistently noted as having an intact concentration upon examination." (*Id.*) Finally, he stated that the state-agency psychological consultants both opined, "in opinions that are uncontradicted by any treating, examining, or reviewing psychological source," that Claimant "had no more than a mild limitation in [concentrating, persisting, or maintaining pace]." (*Id.*)

In concluding that Claimant "has a mild limitation" in adapting or managing herself, the ALJ observed that "[i]n both of her function reports, [Claimant] asserted that she had troubles handling stress and handling changes in routine." (*Id.*) He also noted that "she did have some examinations where she had a negative mood and affect," but "on most occasions, she is noted as having a normal mood and affect . . . as well as normal judgment and insight." (*Id.*) And he observed that Claimant's "psychiatric issues seemed to improve with her treatment." (*Id.* at 20.)

Lastly, the ALJ explained that he accorded "significant weight" to the state-agency psychological consultants' opinions because "[t]heir assessments are entirely consistent with and supported by the normal or essentially normal psychological findings throughout the entire medical record," including in the treatment notes from Claimant's psychiatrist. (*Id.*) He again stated that the consultants' opinions were "uncontradicted by that of any treating or examining source." (*Id.*) And he observed that Claimant's "mental health conditions were much improved with treatment." (*Id.*)

The ALJ's analysis complies with the regulations. *See Patterson*, 846 F.3d at 662 (stating that ALJ must "rate [the claimant's] four areas of functional limitation . . . according to the prescribed scale" and "explain how he reached his conclusions about the severity of the mental impairment" (citing 20 C.F.R. § 404.1520a(c), (d))). Notably, aside from listing her diagnoses, Claimant fails to elaborate on how the ALJ's conclusions were incorrect. (ECF No. 8 at 5.) A diagnosis alone is insufficient to establish the severity of an impairment. *Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (report and recommendation of magistrate judge) (citing *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)); *see Smith v. Berryhill*, No. 3:16-cv-11868, 2018 WL 3800039, at *9 (S.D.W. Va. July 17, 2018) ("[A] diagnosis is insufficient to prove disability—rather, there must be resultant functional limitations precluding a claimant's ability to work." (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986))), *adopted by* 2018 WL 3795277 (S.D.W. Va. Aug. 9, 2018). And the most recent of the treatment notes Claimant cites, dated July 3, 2017, indicates that Claimant's depression and anxiety were "well controlled on medication." (Tr. at 535.) This evidence further suggests that her mental impairments are not severe. *Lemay v. Colvin*, No. WGC-15-cv-1615, 2016 WL 3027528, at *5 (D. Md. May 27, 2016) (upholding ALJ's conclusion that mental impairments not severe where "[m]ental health treatment notes indicate that the claimant's condition is stable on medication and that his symptoms significantly improved"); *see Gross*, 785 F.2d at 1166 ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

Accordingly, the undersigned **FINDS** that the ALJ properly determined that Claimant's mental impairments are not severe.

B. *RFC Assessment*

Claimant next argues that given her "severe physical impairments," she cannot "engage in light exertional work activities." (ECF No. 8 at 5–6.) But again, as with respect to her mental impairments, Claimant only lists her diagnoses and fails to explain how her physical impairments limit her ability to work. (*Id.*) As the undersigned has already explained, "it is not enough to merely point to a medical diagnosis in order to establish disability. Instead, Claimant must also show how that condition results in actual functional limitation." *Parsons v. Berryhill*, No. 3:18-cv-01107, 2019 WL 2252023, at *11 (S.D.W. Va. May 2, 2019), *adopted by* 2019 WL 2256395 (S.D.W. Va. May 24, 2019); *Brooks v. Berryhill*, No. 5:17-cv-91, 2018 WL 3717217, at *5 (W.D.N.C. July 19, 2018) ("Even if a plaintiff can show a diagnosis of a potentially disabling impairment, he still bears the burden of demonstrating that he suffers functional loss resulting therefrom." (citing *Felton-Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir. 2011) (per curiam); *Gross*, 785 F.2d at 1166)), *adopted by* 2018 WL 3715752 (W.D.N.C. Aug. 3, 2018); *Jeffries v. Comm'r of Soc. Sec.*, No. 1:12-cv-162, 2014 WL 1255833, at *5 (N.D.W. Va. Mar. 26, 2014) ("[T]he claimant has the burden of proving her RFC." (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam))); *Williams-Wright v. Colvin*, No. 3:13-cv-174-RJC-DSC, 2014 WL 117228, at *4 (W.D.N.C. Jan. 10, 2014) (memorandum and recommendation of magistrate judge) ("It is Plaintiff's burden . . . to establish her RFC by showing how her impairments affect her functioning." (citing 20 C.F.R. §§ 404.1512(c), 416.912(c))); *Sullivan v. Astrue*, No. 5:11-cv-00130, 2012 WL 5409834, at *3 (W.D. Va. Nov. 2, 2012) ("[P]laintiff had the burden to demonstrate not only that she suffered diagnosable conditions, but that those maladies functionally limited her in a way that

disabled her from her past relevant work."), *adopted by* 2012 WL 5929139 (W.D. Va. Nov. 27, 2012). She has not done so here.

Moreover, the ALJ properly conducted the RFC assessment. "In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). The ALJ in this case explained, "The assessed limitation to the light exertional level in terms of lifting and carrying, as well as the preclusion on balancing, ladder climbing, and hazards, are consistent with the assessment of the State agency medical consultant as well as [Claimant's] back pain and lower extremity pain." (Tr. at 22 (internal citations omitted).) The ALJ further noted that he included "the limitations on exposure to temperature extremes, humidity, wetness, vibration, and environmental irritants" based on the state-agency medical consultant's opinion "in an attempt to afford [Claimant] the maximum benefit of the doubt, although the [ALJ] can find little basis in the record for certain of these assessed restrictions." (*Id.*) In addition, the ALJ explained,

> The limitation to the sedentary level in terms of standing and walking, as well as the assessment of claimant's postural limitations, reflects in part consideration of [Claimant's] obesity considered under SSR 02-1p. The limitation on continuous sitting is consistent with [Claimant's] testimony. The limitations on lower extremity use and the assessed limitation to

sedentary-level standing and walking, as well as certain of the postural limitations, reflect also [Claimant's] osteoarthritis in her knees and her restless leg syndrome, as well as the more recent finding of lower extremity edema.  The assessed climbing, balancing and hazard restrictions are due to [Claimant's] vertigo.   The limitations on noise exposure are due to [Claimant's] mild hearing loss and tinnitus.   The need for an on-site bathroom is included due to [Claimant's] diagnosed irritable bowel syndrome.  Finally, the limitation to the performance of simple, routine and repetitive tasks reflects [Claimant's] insomnia, sleep apnea, pain, and fatigue, with the latter likely being attributable in part to her anemia.

(*Id*. at 22–23 (internal citations omitted).)  The ALJ continued, "Despite these assessed limitations, many recent physical examination reports have noted normal or essentially normal results, including a normal gait, normal strength and full ranges of motion. . . . Therefore, the above-delineated [RFC] is an attempt to afford [Claimant] the benefit of any reasonable doubt[.]"  (*Id*. at 23 (internal citations omitted).)  He further explained that he accorded "some weight" to the state-agency medical consultant's opinion because it was largely consistent with the RFC assessment, but "the consultant did not have access to the more recent medical records" relating to Claimant's fatigue, vertigo, leg pain, lower extremity edema, and restless leg syndrome.  (*Id*. at 24.)

The ALJ's explanation demonstrates that he considered the functional limitations that Claimant's conditions could be expected to produce, in addition to Claimant's representations about those limitations and her abilities, and assessed how the objective medical findings reflected Claimant's capacity for work.  In other words, the ALJ complied with his obligation to "discuss[] . . . which evidence [he] found credible and why, and

specific[ally] appli[ed] . . . the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (citing *Hines v. Bowen*, 872 F.3d 56, 59 (4th Cir. 1989)).  The undersigned therefore **FINDS** that the RFC assessment is supported by substantial evidence.

### C. Subjective Complaints

Lastly, Claimant argues that the ALJ improperly evaluated her subjective complaints about her symptoms and "should have accepted the testimony of the [VE] who testified that [Claimant] cannot engage in any substantial gainful activity if she is off-task more than 15% of the normal workday and/or misses more than 1 day per month."  (ECF No. 8 at 6–7.)  As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments." *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)).  To evaluate the disabling effect of an individual's symptoms, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  An individual's subjective complaints about her symptoms are relevant to the latter determination.  *See id.* §§ 404.1529(c)(3), 416.929(c)(3).  Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the

24

claimant." *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (per curiam) (quoting *Craig*, 76 F.3d at 591). The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

Here, the ALJ began his evaluation of Claimant's subjective complaints by reviewing her July 2016 function report, in which she "reported her impairments limit her ability to lift, walk, climb stairs, squat, sit, bend, kneel, use her hands, stand, complete tasks, reach, and hear." (Tr. at 22.) The ALJ noted that Claimant "asserted these impairments cause her issues with sleeping, performing personal care, making meals, doing any house or yard work, and enjoying her hobbies." (*Id.*) He also noted that "she reported that she is still able to get around, shop, handle money, watch television, talk on the phone, go to doctors' appointments and stores, drive, and do crafts to a certain extent." (*Id.*)

The ALJ observed that these representations were "fairly consistent" with Claimant's hearing testimony, which he summarized as follows:

> [Claimant] stated that her knees are painful, due to arthritis, along with other parts of her body, including her hands. She also claimed that she falls frequently and that her weight causes her problems with her lower extremities. She stated that she has trouble sitting because of her back pain and knee pain and standing because of pain in her feet and legs. She further claimed that she is easily fatigued and has problems with vertigo. She also alleged that she has had some problems recently with leg swelling.

(*Id.*)

The ALJ then explained, "The record establishes that [Claimant's] impairments have caused pain and functional limitations during the relevant period, but not to the extent that [she] alleges." (*Id.*)  In his review of the medical evidence of record, the ALJ noted that Claimant was diagnosed with sciatica in October 2014, and "she had an exacerbation of [her back] issues . . . in May 2016," which "was again treated with pain medications and muscle relaxers." (*Id.* at 23.)  However, the ALJ observed, Claimant's "back impairment is not mentioned as an ongoing problem in the medical record after [May 2016]." (*Id.*)

He further noted that Claimant was diagnosed with osteoarthritis in her knees in early 2015, and "Radiographs from June 2015 . . . show mild degenerative changes in her knees." (*Id.*)  The ALJ related that Claimant's knee pain was treated with medication, and she "later received injections, which reportedly did little to help her condition," but "her knee issues are not mentioned as an ongoing problem in the medical record after [December 2015]." (*Id.*)  The ALJ observed that Claimant "has had some ongoing lower extremity issues related to her restless leg syndrome, which she treats with medication, and edema." (*Id.* (internal citations omitted).)

Lastly, the ALJ explained that Claimant "has had significant sleep issues" caused by "severe obstructive sleep apnea," for which Claimant "uses a CPAP regularly." (*Id.*)  He noted that her "significant sleep disturbance" and insomnia "contribute, in part, to her fatigue, which has been an ongoing issue." (*Id.*)  And he observed that she "suffers from vertigo and has treated with balance specialists" who "were able to temporarily improve her balance." (*Id.* (internal citation omitted).)

As the undersigned has already explained, the ALJ addressed the effects of each of these conditions in his RFC assessment, in particular limiting Claimant "to the light

exertional level in terms of lifting and carrying" and "to the sedentary level in terms of standing and walking" and imposing other restrictions due to her back and leg pain. (*Id.* at 22.) He required a "limitation on continuous sitting" due to Claimant's testimony and imposed "climbing, balancing and hazard restrictions" because of Claimant's vertigo. (*Id.*) And he limited Claimant "to the performance of simple, routine and repetitive tasks" to accommodate her insomnia, sleep apnea, pain, and fatigue. (*Id.* at 23.)

Essentially, Claimant appears to assert that her diagnoses indicate that she has symptoms that would cause her to be "off-task more than 15% of the normal workday" or to miss more than one day per month. (*See* ECF No. 8 at 6.) But this is only part of the analysis. Once the ALJ finds "objective medical evidence showing a condition that could reasonably produce the alleged symptoms"—*i.e.*, a diagnosis—he must then assess whether the record supports "the claimant's statements about symptoms and their functional effects." *Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017) (citing 20 C.F.R. §§ 404.1529(b), (c)(4), 416.929(b), (c)(4)). To that end, "[a] claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence." *Anthony v. Colvin*, No. 3:12-cv-2413 DCN, 2013 WL 6284442, at *10 (D.S.C. Dec. 4, 2013) (report and recommendation of magistrate judge) (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). Contrary to Claimant's assertion, "a diagnosis alone does not establish functional limitations." *Jones v. Colvin*, No. 6:14-cv-01328-RBH, 2015 WL 4095863, at *14 (D.S.C. July 6, 2015) (report and recommendation of magistrate judge). Claimant offers no reasoning to support her assertion that the ALJ's RFC assessment did not adequately account for the limitations caused by her conditions. (*See* ECF No. 8 at 6–7.) Further, the ALJ was not required to accept the VE's testimony with

respect to a hypothetical question from Claimant's counsel that was not supported by the record. *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (stating that ALJ's hypothetical questions to VE "need only incorporate those limitations which are credibly established in the record" (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989))); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)); *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) ("[A]n ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000))).

Simply put, the ALJ in this case "explained his reasoning and weighed [Claimant's] subjective statements against other evidence." *Ladda v. Berryhill*, 749 F. App'x 166, 170 (4th Cir. 2018). He was not required to do more. As such, the undersigned **FINDS** that the ALJ did not err in his evaluation of Claimant's subjective complaints.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 8), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Goodwin.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: April 1, 2020

Dwane L. Tinsley
United States Magistrate Judge